UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION



| UNITED STATES OF AMERICA | : | Case No. 2 : 19 cr 067 |
| | : | |
| vs. | : | Judge Marbley |
| | : | |
| ROGER DALE ANDERSON, | : | 18 U.S.C. §2 |
| | : | 18 U.S.C. §1347 |
| | : | 18 U.S.C. §1349 |
| | : | 21 U.S.C. §841(a)(1) &(b)(1)(C) |
| | : | 21 U.S.C. §846 |

## INDICTMENT

THE GRAND JURY CHARGES:

## INTRODUCTION

At all relevant times to this Indictment, and unless otherwise alleged:

1.      Defendant ROGER DALE ANDERSON (hereinafter "ANDERSON") was a physician who obtained his medical license from the Ohio State Medical Board in 1992.

2.      ANDERSON also obtained his medical license in the states of Michigan, Pennsylvania, and West Virginia.

3.      ANDERSON owned and operated Marietta Medical, which was located at 101 and 121 Putnam St., Marietta, Ohio within the Southern District of Ohio.

4.      121 Putnam Street was also known as the Putnam Street Commons. The first floor area had several shops and a kiosk area. Marietta Medical occupied Suite 205.

5.      ANDERSON received a DEA registration number that allowed him to prescribe controlled substances, including Schedules II through V, for a legitimate medical purpose while acting in the usual course of professional practice.

1

The Controlled Substance Act and the Code of Federal Regulations

6.     The Controlled Substances Act (CSA) governs the manufacture, distribution, and dispensation of controlled substances in the United States. The term "controlled substance" means a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV, and V, as designated by Title 21, United States Code, Section 802(6) and the Code of Federal Regulations. With limited exceptions for medical professionals, the CSA makes it "unlawful for any person knowingly or intentionally" to "distribute or dispense a controlled substance" or conspire to do so.

7.     The CSA's scheduling of controlled substances were based on their potential for abuse, among other considerations. There are five schedules of controlled substances: Schedules I, II, III, IV and V. "Schedule I" means the drug or other substance has no currently accepted medical use and has a high potential for abuse. The term "Schedule II" means the drug or other substance has a high potential for abuse. The drug has a currently accepted medical use with severe restrictions, and the abuse of the drug or other substance may lead to severe psychological or physical dependence. The term "Schedule III" means the drug or other substance has a potential for abuse and could lead to moderate or low physical and psychological dependence. The term "Schedule IV" means the drug or other substance has a low potential for abuse and low risk of dependence. The term "Schedule V" means the drug or other substance has a low potential for abuse.

8.     The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner; it included the prescribing of a controlled substances. The term "distribute" means to deliver (other than by administer or dispensing) a controlled substance.

9.      Medical professionals, including doctors and pharmacists, who wanted to distribute or dispense controlled substances in the course of professional practice were required to register with the Attorney General of the United States (Attorney General) before they were legally authorized to do so. Such medical professionals would be assigned a registration number by the DEA.

10.      Medical professionals registered with the Attorney General were authorized under the CSA to write prescriptions for or to otherwise dispense Schedule II, III, IV, and V controlled substances, as long as they complied with the requirements of their registration. 21 U.S.C. §822(b). The CSA prohibited any person from knowingly and intentionally using a DEA registration number issued to another person in the course of distributing or dispensing a controlled substance.

11.      For doctors, compliance with the terms of their registration meant that they could not issue a prescription unless it was "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. §1306.04(a). A doctor violated the CSA and Code of Federal Regulations if he or she issued an order for a controlled substance outside the usual course of professional medical practice and not for a legitimate medical purpose. Such an order is "not a prescription within the meaning and intent of the CSA," and such knowing and intentional violations subjected the doctor to criminal liability under Section 841 of Title 21, United States Code. 21 C.F.R. §1306.04(a).

12.      21 C.F.R. §1306.05(a) provides that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner."

13.     Pursuant to the CSA and its implementing regulations, oxycodone was classified as a Schedule II narcotic controlled substance based on its high potential for abuse and potential for severe psychological and physical dependence. Oxycodone was sold under a variety of brand names, including OxyContin and Percocet, as well as generic forms. Oxycodone was one of the strongest prescription painkilling substances approved for use in the United States, and it was highly addictive. When abused, oxycodone could be taken orally (in pill form), chewed, or crushed and snorted. Oxycodone caused euphoria and a high that persons with a dependency would seek, despite not have a medical need for the drug.

14.     Oxycodone, including OxyContin and Percocets, were typically sold on the street in Ohio for up to $1 per milligram. Percocet was manufactured in strengths containing 5 mg, 7.5 mg, or 10 mg of oxycodone per Percocet tablet.

15.     Pursuant to the CSA and its implementing regulations, hydrocodone was classified as a Schedule II drug, effective October 6, 2014. Prior to its classification as a Schedule II drug, hydrocodone was a Schedule III drug. Hydrocodone was moved up as a Schedule II narcotic controlled substance based on its potential for abuse and physical and psychological dependence. Hydrocodone was sold generically or under a variety of brand names, including Vicodin, and came in varying strengths. Hydrocodone could be used to treat pain symptoms under the careful supervision of a physician, but was highly addictive. Hydrocodone caused euphoria and a high that persons with a dependency would seek, despite not have a medical need for the drug.

### The Victim Health Care Programs

16.     The information provided in this section describes the victim health care benefit programs and serves as the R. Crim P. 12.4 Disclosure Statement.

The Ohio Bureau of Workers' Compensation

17. The Ohio Bureau of Workers Compensation (BWC) is a public "no fault" insurance system that compensates employees for work related injuries or illnesses. Currently BWC provides insurance to approximately two-thirds of Ohio's work force. Employees not covered directly by BWC receive coverage through their employers. These companies are part of a self-insurance program for large and financially stable employers who meet strict qualifications set by BWC.

18. BWC manages all medical and lost-time claims, initiates coverage and determines premium rates and manual classifications. BWC also collects premiums from employers, determines the initial allowance or denial on claim applications, disburses money to pay compensation, and manages the state insurance fund.

19. BWC utilizes Managed Care Organizations (MCOs) to assist with the administration of benefits and services to BWC beneficiaries.

20. Providers who are certified with BWC receive a Provider Identification Number (PIN) which allows BWC to identify the provider who rendered the billed services. In addition, each qualified BWC patient receives a member Identification Number to identify the patient as an authorized recipient of health benefits.

21. BWC further requires certified providers to properly document patient office visits in accordance with BWC policies, rules and regulations.

22. Providers will be reimbursed by BWC for rendered medical services provided they are certified by BWC, the services provided were properly documented and in accordance with BWC rules and regulations, were medically necessary, properly coded and in compliance with federal and state laws, rules and regulations.

23. Health care providers enter into provider agreements with BWC in order to submit claims for reimbursement. BWC requires that the provider be licensed with the appropriate State Board governing the laws of their specialty.

24. Participating providers agree to provide services, submit the claims and accept payments as specified in fee schedules, pricing formulas, and terms of the provider agreement/contract from BWC. The provider signs a provider agreement which requires them to retain complete records and fully disclose the services provided to members of BWC. The provider of services, in order to receive reimbursement, submits a Health Insurance Claim form in a paper or an electronic format to be approved by BWC. Based upon information submitted by the provider representing services rendered, BWC pays the provider either by mail or electronic transfer. Health care claim forms, both paper and electronic, contain certain patient information and CPT codes.

25. BWC is a "health care benefit program" as defined in 18 U.S.C. §24(b).

### The Medicare Program

26. The Medicare Program was enacted by Congress on July 30, 1965, under Title XVIII of the Social Security Act. The Medicare Program was designed to provide medical insurance protection for covered services to any person age 65 or older, and to certain disabled persons. Medicare is a health care benefit program as defined in 18 U.S.C. Section 24(b) and within the meaning of 18 U.S.C. Sections 1347 and 1035.

27. The United States Department of Health and Human Services ("HHS") was, and is an agency of the United States. The Centers for Medicare and Medicaid Services ("CMS") was the agency of HHS delegated with administering Medicare.

28.     CMS administered Medicare Part B through private insurance companies known as "carriers." Medicare Part B helped pay the cost of health care items and physician's services, including office visits, outpatient therapy, medical supplies and medical tests.

29.     Medicare Part D subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. It was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006. Part D benefits were administered by private insurance plans that were reimbursed by Medicare through CMS.

30.     Beneficiaries could obtain Part D benefits in two different ways: they could join a Prescription Drug Plan which covered only prescription drugs; or they could join a Medicare Advantage Plan that covered both prescription drugs and medical services.

31.     Typically, a Medicare beneficiary enrolled in a Medicare Part D plan would fill their prescription at a pharmacy utilizing their Medicare Part D plan coverage to pay for the prescription. The pharmacy would then submit the prescription claim for reimbursement to the Medicare Part D beneficiary's plan for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan identification number.

32.     Medicare is a "health care benefit program" as defined in 18 U.S.C. §24(b).

33.     Providers who provided services to Medicare beneficiaries used a number assigned to the patient to fill out claim forms. The claim form was submitted by the provider to make claims for payment to Medicare. Medicare processed each health insurance claim form and issued payment to the provider for the approved services. Providers submitted claims in paper format, or by electronic means.

7

34.      Health care claim forms, both paper and electronic, contained certain patient information and treatment billing codes including CPT, HCPCS, and NDC codes. Health care programs had established payment schedules based on the codes billed by the provider. By designating a certain code, the provider certified to the health care program that a given treatment was actually rendered in compliance with the code requirements and was medically necessary. These treatment billing codes were well known to the medical community, providers, and health care insurance companies.

35.      Medicare used the written claim forms and or electronic invoices to establish the validity of health care claims entitled to payment. A provider who submitted claims to Medicare certified that the treatment was provided by a qualified individual, actually given to the patient as documented and was medically necessary for the health of the patient.

The Medicaid Program

36.      Medicaid, established by Congress in 1965, provided medical insurance coverage for individuals whose incomes were too low to meet the costs of necessary medical services. Approximately 60% of the funding for Ohio's Medicaid program came from the federal government. The Ohio Department of Medicaid (ODM), Columbus, Ohio, managed the Medicaid program, which was managed previously by the Ohio Department of Job and Family Services (ODJFS). ODM received, reviewed, and obtained formal authority to make payment of Medicaid claims submitted to it by providers of health care.

37.      ODM contracted with Medicaid Managed Care Organizations (MCOs) through contracts known as Contractor Risk Agreements (CRAs), which conformed to the requirements of 42 U.S.C. §§1395mm and §1396b(m), along with any related federal rules and regulations. MCOs were health insurance companies that provided coordinated health care to Medicaid

8

beneficiaries. The MCOs contracted directly with healthcare providers, including hospitals, doctors, and other health care providers to coordinate care and provide the health care services for Medicaid beneficiaries. Providers who contracted with an MCO, were known as Participating Providers. Pursuant to the CRAs, ODM distributed the combined state and federal Medicaid funding to the MCOs, which then paid Participating Providers for treatment of Medicaid beneficiaries.

38.     CareSource, Molina and United Healthcare were Medicaid MCOs that paid claims for medical services and items submitted by Marietta Medical and ANDERSON.

39.     Medicaid paid health care providers, pursuant to written agreements, on the basis of reasonable charges for covered services provided to beneficiaries.

40.     Pursuant to the rules and regulations of the Ohio Medicaid Program, including Medicaid MCOs, Medicaid only paid for services that were actually performed by qualified individuals, were medically necessary, and provided in accordance with Federal and State laws rules and regulations.

41.     Medicaid and Medicaid MCOs are "health care benefit programs" as defined in 18 U.S.C. §24(b).

42.     Providers who provided services to Medicaid beneficiaries used a number assigned to the patient to fill out claim forms. The claim form was submitted by the provider to make claims for payment to Medicaid or Medicaid MCOs. Medicaid or Medicaid MCOs processed each health insurance claim form and issued payment to the provider for the approved services.  Providers submitted claims in paper format, or by electronic means.

43.     Health care claim forms, both paper and electronic, contained certain patient information and treatment billing codes including CPT, HCPCS, and NDC codes.  Health care

programs had established payment schedules based on the codes billed by the provider. By designating a certain code, the provider certified to the health care program that a given treatment was actually rendered in compliance with the code requirements and was medically necessary. These treatment billing codes were well known to the medical community, providers, and health care insurance companies.

44. Medicaid used the written claim forms and or electronic invoices to establish the validity of health care claims entitled to payment. A provider who submitted claims to ODM or Medicaid MCOs certified that the treatment was provided by a qualified individual, actually given to the patient as documented and was medically necessary for the health of the patient.

Coding

45. The American Medical Association assigned and published numeric codes known as the Current Procedural Terminology (CPT) and HCFA Common Procedure Coding System (HCPCS) codes. The codes were a systematic listing, or universal language, used to describe the procedures and services performed by health care providers. The procedures and services represented by the codes were health care benefits, items, and services within the meaning of Title 18, United States Code Section 24(b). They included codes for office visits, diagnostic testing and evaluation, and other services. Drug products were identified and reported to the Federal Drug Administration using a unique three (3) segment number called the National Drug Code (NDC), which was a universal product identifier for human drugs. Health care providers and health care benefit programs use CPT, HCPCS, and NDC codes to describe and evaluate the services and drugs for which they claim have been provided in order to decide whether to issue or deny payment. Each health care benefit program establishes a fee reimbursement for each drug or service described by a CPT, HCPCS, and/or NDC code. The procedures and services

10

represented by CPT codes were health care benefits, items, and services, within the meaning of

Title 18, Section 24(b), United States Code.

46.     Specific CPT codes were assigned for evaluation and management (E/M) services

provided to establish patients in a physician's office (some of the E/M services were known as

"office visits"). Among these E/M services were office visits billed under CPT codes "99211,"

"99212," "99213," "99214," and "99215." Insurance companies reimbursed health care

providers at increasing rates based upon the level of complexity indicated by the office visit

codes. The codes for 99211 through 99215 provided in relevant part:

     a.  99211: Office or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

     b.  99212: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) a problem-focused history; (2) a problem-focused examination; (3) straightforward medical decision-making. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are self-limited or minor. Physicians typically spend 10 minutes face-to-face with the patient and/or family.

     c.  99213: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) an expanded problem-focused history; (2) an expanded problem-focused examination; (3) medical decision-making of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Physicians typically spend 15 minutes face-to-face with the patient and/or family.

     d.  99214: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) a detailed history; (2) a detailed examination; (3) medical decision-making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are

of moderate to high severity. Physicians typically spend 25 minutes face-to-face with the patient and/or family.

e. 99215: Office or outpatient visit for the evaluation and management of an established patient which requires at least 2 of these 3 key components: (1) a comprehensive history; (2) a comprehensive examination; (3) medical decision making of high complexity. Usually, the presenting problem(s) are of moderate to high severity. Typically, 40 minutes are spent face to face with the patient and/or family.

47.     CPT codes 99212 through 99215 are required to be performed by a physician or qualified health care professional and billed under the name of physician or qualified health care professional that provided the services.

## COUNT 1
Conspiracy to Dispense and Distribute Controlled Substances
[21 U.S.C. §846]

The Grand Jury further charges that:

48.     Paragraphs 1 through 47 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

49.     Beginning on or about January 1, 2012 and continuing through March 29, 2016, within the Southern District of Ohio, ROGER DALE ANDERSON,  along with others known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to knowingly, intentionally, and unlawfully distribute and dispense, or caused to be distributed and dispensed through prescriptions, mixtures of substances containing  a detectable amount of a Schedule II controlled substance,  other than for a legitimate medical purpose in the usual course of professional practice, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

In violation of 21 U.S.C. §846.

Nature and Purpose of Conspiracy

The purpose of the conspiracy was to maximize profits and cause the illegal dispensing of controlled substances, such as oxycodone, hydrocodone and other Schedule II and III opioids, by distributing and dispensing such medications outside the bounds of the accepted medical practice.

Ways, Manners and Means of the Conspiracy

50.    It was part of the conspiracy that ANDERSON would pre-sign prescriptions for staff to complete and distribute to patients in his absence.

51.    It was further part of the conspiracy, at the direction of ANDERSON, the office staff would pass out prescriptions for Schedule II and III controlled substances, including oxycodone and hydrocodone, to patients on days when ANDERSON had not completed a medical evaluation of the patients.

52.    It was further part of the conspiracy that at the direction of ANDERSON, the pre-signed prescriptions were distributed to patients by staff, who were not legally qualified to issue, distribute or dispense prescriptions for Schedule II and III controlled substances.

53.    It was further part of the conspiracy that at the direction of ANDERSON, prescriptions for Schedule II and III controlled substances would be distributed at the kiosk at Putnam Commons.

54.    It was further part of the conspiracy that ANDERSON would not establish legitimate diagnosis of patients, or create treatment goals for the care of the patient.

55.    It was further part of the conspiracy that ANDERSON failed to appropriately document medical visits with patients, if they occurred.

56. It was further part of the conspiracy that ANDERSON would not request prior medical records, or determine the legitimacy of medical complaints of patients.

57. It was further part of the conspiracy that ANDERSON would ignore red flags that his patients were diverting or abusing the prescribed medication.

58. It was further part of the conspiracy that ANDERSON would infrequently conduct urine screens, but frequently ignore the results.

59. It was further part of the conspiracy that ANDERSON failed to monitor prescription data monitoring programs (PDMP) that assisted practitioners in identifying patients that exhibited doctor shopping behavior.

In violation of 21 U.S.C. §§841(a)(1), (b)(1)(C), (b)(1)(E)(i) and 846.

## COUNTS 2 THROUGH 10
### Illegal Dispensing of Schedule II Controlled Substances
### [21 U.S.C. §§841(a)(1) and (b)(1)(C)]

60. On or about the dates set forth below, in the Southern District of Ohio, Defendant ROGER DALE ANDERSON, aided and abetted by individuals both known and unknown to the Grand Jury, knowingly and intentionally dispensed and distributed a quantity of Schedule II controlled substances, as identified in the chart below, not for a legitimate medical purpose in the usual course of professional practice:

| COUNT | PATIENT INTIALS | DATE PRESCRIPTION ISSUED | SCHEDULE II CONTROLLED SUBSTANCE | QUANTITY |
|---|---|---|---|---|
| 2 | JB | 6/18/2015 | Oxycodone 5mg | 120 |
| 3 | JT | 3/3/2015 | Hydrocodone-Acetaminophen 10/325 mg | 150 |

14

| 4 | KB | 4/28/2015 | Oxycodone-Acetaminophen 5/325 mg | 90 |
| 5 | AG | 4/16/2015 | Oxycodone-Acetaminophen 10/325 mg | 180 |
| 6 | JC | 11/11/2014 | Hydrocodone-Acetaminophen 5/325 mg | 120 |
| 7 | RR | 8/14/2015 | Oxycodone HCL 10 mg | 120 |
| 8 | AM | 5/5/2015 | Hydrocodone-Acetaminophen 5/325 mg | 240 |
| 9 | GS | 1/8/2016 | Oxycodone-Acetaminophen 7.5/325 mg | 120 |
| 10 | CS | 10/21/2014 | Hydrocodone-Acetaminophen 10/325 mg | 120 |

All in violation of 21 U.S.C. §841(a)(1) and (b)(1)(C).


COUNT 11
Conspiracy to Commit Health Care Fraud
[18 U.S.C. 1349]

61.     Paragraphs 1 through 59 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

62.     From on or about January 1, 2012 and continuing through March 29, 2016, in the Southern District of Ohio, Defendant ROGER DALE ANDERSON, did knowingly and willfully combine, conspire, confederate and agree with others, both known and unknown to the Grand Jury, to violate 18 U.S.C. § 1347, that is, to execute a scheme to defraud a health care benefit program as defined in 18 U.S.C. §24(b), that is the Ohio Bureau of Workers' Compensation

15

program, the Ohio Medicaid Program, and the Medicare Program, in connection with the

delivery or payment for health care benefits, items or services.

Purpose of the Conspiracy

63.    It was the purpose of the conspiracy that ANDERSON and co-conspirators, both

known and unknown, unlawfully enriched themselves by submitting claims or causing claims to

be submitted to health care benefit programs for: 1) prescriptions for Schedule II and III

controlled substances that were illegally dispensed and distributed; 2) medical services that were

not provided; and 3) upcoded office visits provided by ANDERSON.

Manner and Means of the Conspiracy

64.    It was part of the conspiracy that ANDERSON and co-conspirators, both known

and unknown, caused the submission of claims to health care benefit programs for Schedule II

controlled substances that were dispensed and distributed by pharmacies as a result of the pre-

signed prescription that were illegally issued to patients.

65.    It was further part of the conspiracy that ANDERSON submitted or caused the

submission of claims to health care benefit programs for visits using CPT codes 99212 through

99214, for services not provided.

66.    It was further part of the conspiracy that ANDERSON caused the submission of

claims to health care benefit programs for office visits where there was no evidence or

documentation that the visit ever occurred.

67.    It was further part of the conspiracy that ANDERSON caused the submission of

claims for upcoded office visits that were billed under CPT code 99214, falsely representing the

16

level of exam and medical decision making used during the office visit, in order to receive inflated reimbursement from the health care benefit programs.

In violation of 18 U.S.C. §1347 and §1349.

## COUNT 12
### Health Care Fraud
### [18 U.S.C. §1347]

68.    Paragraphs 1 through 59, and 61 through 65 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

69.    From on or about January 1, 2012 and continuing through March 29, 2016, in the Southern District of Ohio, Defendant ROGER DALE ANDERSON, knowingly and willfully executed a scheme or artifice to defraud a health care benefit program as defined by 18 U.S.C. §24, in connection with the delivery or payment for, health care benefits, items or services by causing the submission of claims to health care benefit programs for prescriptions that were issued in violation of law or otherwise outside the bounds of accepted medical practice.

All in violation of 18 U.S.C. §1347 and §2.

## COUNT 13
### Health Care Fraud
### [18 U.S.C. §1347]

70.    Paragraphs 1 through 59, and 61 through 65 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

71.    From on or about January 1, 2012 and continuing through March 29, 2016, in the Southern District of Ohio, Defendant ROGER DALE ANDERSON, knowingly and willfully executed a scheme or artifice to defraud a health care benefit program as defined by 18 U.S.C. §24, in connection with the delivery or payment for, health care benefits, items or services by

causing the submission of claims to health care benefit programs for medical services that were not provided.

All in violation of 18 U.S.C. §1347 and §2.

COUNT 14
Health Care Fraud
[18 U.S.C. §1347]

72.     Paragraphs 1 through 59, and 61 through 65 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

73.     From on or about January 1, 2012 and continuing through March 29, 2016, in the Southern District of Ohio, Defendant ROGER DALE ANDERSON, knowingly and willfully executed a scheme or artifice to defraud a health care benefit program as defined by 18 U.S.C. §24, in connection with the delivery or payment for, health care benefits, items or services by causing the submission of claims that were upcoded.

All in violation of 18 U.S.C. §1347 and §2.

A TRUE BILL.


_s/FOREPERSON_____
FOREPERSON


BENJAMIN C. GLASSMAN
UNITED STATES ATTORNEY


KENNETH F. AFFELDT (0052128)
Assistant United States Attorney


MARITSA A. FLAHERTY (0080903)
Assistant United States Attorney